73 So.2d 747

### SELLERS v. HEAD.

6 Div. 472.

Supreme Court of Alabama.

March 11, 1954.

Rehearing Denied June 30, 1954.

Lange, Simpson, Robinson & S'omerville, Birmingham, for appellant.

Wm. S. Pritchard, Victor H. Smith and Pritchard, McCall & Jones, Birmingham, for appellee.

SIMPSON, Justice.

Sellers, the appellant, filed a bill in equity to enjoin the sale of certain shares of stock of Baggett Transportation Company which had been pledged as collateral security for two notes then past due and unpaid executed by appellant to appellee Head. The bill, in addition to praying for an injunction against the proposed sale, offered to do equity and sought to redeem the shares of stock by paying any amount found by the court to be due on said notes. The final decree denied injunctive relief and fixed the amount due by the notes, including interest and attorney's fee. The appeal has proceeded from that decree.

On December 31, 1941, the appellee and the appellant entered into a contract whereby Head sold to Sellers thirteen shares of stock in the Baggett Transportation Company. That section of the contract as applicable to the case reads as follows:

"It is understood that the purchaser has paid and agreed to pay the above sums [the amount represented by the stock purchase notes] for said stock, relying upon the books of the company as to the present condition of the company. It is expressly agreed that in the event liability for taxes of any kind (including income taxes) not now known by the Purchaser to exist, and not now shown by the books of the Company as a liability, shall later be assessed and paid and in the event liability for violation of any law * * * shall be imposed * * * and said liability shall be paid by the Company * * * then and in that event Beverly P. Head, Jr., shall credit on the next maturing note held by him thirteen-fortieths ($^{13}/_{40}$ths) of such additional liability so imposed on the company and paid by it. In the event, however, said notes have been paid in full prior to the discovery of such additional liability, the Vendor shall be under no obligation to make good the same. * * *"

Five notes were executed contemporaneously by Sellers to Head, payable over a period of five years to secure the balance of the purchase price by Sellers under his contract; the last two of these were due on or before January 2, 1946, and January

2, 1947. The certificate for the thirteen shares of stock being deposited with Head as collateral security for the notes and the notes being past due and unpaid, Head advertised the sale of the collateral under the power contained in the notes. Sellers, the appellant, then filed the bill seeking an injunction against the proposed sale. The pertinent facts on which he seeks relief are: In April, 1945, notice of probable liability for taxes for the years of 1932–1939 was given the corporation by agents of the Department of Internal Revenue; in June, 1950, the Collector of Internal Revenue made an assessment against the corporation in the sum of $37,668.18, of which the tax was $17,340.45, interest $11,460.18, penalty $8,867.55, and which liability was discharged by the corporation. The facts which justified such assessment were not shown by the books of the company and were not known to Sellers or Head at the time of the execution of the contract.

On a former appeal of a case between the same parties, involving the same matters (Head v. Sellers, 251 Ala. 453, 37 So. 2d 664), the contract was interpreted to mean that notwithstanding the fact that at the time of the maturity of the notes, the final determination of the amount owing by the corporation was pending and only a compromise offer had been made, i. e., the corporation had not paid the amount ultimately assessed, the vendor's obligation to make the credit was conditioned upon a *discovery* of the tax liability and the credit the purchaser would be entitled to receive could not be decreed until a final determination of the tax liability. Therefore, the tax now having been paid by the corporation, and no other transaction appearing, Sellers contends that he is entitled to a credit on the unpaid notes of a sum equal to 13⁄40ths of the amount ($37,668.18) paid by the corporation—the additional tax liability.

Head, the appellee, contends however, that he is not due to credit said notes with that amount or any part of it because of certain dealings between Sellers and J. D. Baggett, who was president and general manager of the corporation during those years for which the tax was assessed and who caused the delinquent tax liability against the corporation. This conduct of Baggett consisted of Baggett's collection and retention personally of certain sums which were owing the company by customers and which he did not report for the company so as to make the same appear on the books of the company, but appropriated the same to his own use. Had he made proper and prompt returns for the company, as the law required, the tax would have been due and payable long before Head and Sellers became stockholders, and there would have been no delinquent tax liability. At that time the stockholders of the company were Baggett and his wife and what he did was apparently with her knowledge and consent. The government inspector made a discovery of those matters and made the assessment referred to above.

Head contends that since Baggett brought about the delinquent assessment for the income tax by his own misconduct, he personally was liable for its payment; whereas in a later transaction, at a time when Sellers and Baggett were the sole stockholders in the corporation each owning 50% of the stock, Sellers, with full knowledge of the tax liability of the company and the basis of that liability, caused the company to purchase Baggett's stock for the sum of $90,000—a sum which was more than enough to satisfy all tax liabilities; as a part of this transaction the company released Baggett from all tax liability or other claims it might have against him except to the extent of one-half of the amount of the assessment exceeding $28,742.57 (that amount having been paid to the government by the company by way of offer of compromise). This sum was subsequently fixed at $10,021.72, which Baggett paid to the company and the company paid the entire amount of the assessment. Head claims that by virtue of that transaction Baggett was released from his liability to pay the whole or any amount of the assessment, that Sellers was a party to said transaction and, therefore, Head was released from the duty of crediting on the notes 13⁄40ths of said assessment.

The trial court found in agreement with this insistence on the part of Head, and decreed that Sellers could not set off any

part of the deficiency assessment as a result of such transaction. We are in accord with the holding.

The contract between Head and Sellers was construed by us in the former case (Head v. Sellers, supra) to mean that what was uppermost in the mind of the purchaser, Sellers, was that he be protected against a tax liability not shown by the books of the corporation and not known to him. In other words, the undertaking on the part of Head was in the nature of an indemnity to Sellers—an indemnity to the extent of $1\frac{3}{40}$ths of the amount of the unpaid notes—on account of a possible but then undisclosed delinquent tax liability. Obviously, we may observe, a valid, enforceable tax claim against the corporation would work a detriment to Sellers to the extent of the stock purchased by him from Head.

The question arising is, whether the ultimately determined tax liability was one for which Baggett was responsible and, therefore, whether the corporation or Sellers would have had any recourse upon Baggett.

■ During all of the tax years here involved Baggett was president and general manager of the corporation, and the duty devolved upon him, therefore, to make full and truthful returns of the corporate income during those years. 26 U.S.C.A. § 52. That he did not do so appears not to be questioned. On the contrary, he appropriated to himself large amounts of the corporate income—far in excess of the assessment—withheld such amounts from the corporate books and records, and omitted such amounts from the returns made for the corporation to the Internal Revenue Bureau for income tax purposes. That such acts on his part were *ultra vires* and amounted to a breach of trust on his part as such officer of the corporation cannot be gainsaid. Neither can it be questioned that the corporation suffered a subsequently disclosed loss on this account. Had Baggett made full, honest and prompt returns during those previous tax years there would, of course, have been no deficiency tax liability, with consequent penalties and interest, imposed against the corporation at a

much later date. And the books of the corporation would have reflected its true condition.

■ As bearing upon Baggett's liability to the corporation, we call attention to the case of Van Antwerp Realty Corp v. Cooke, 230 Ala. 535, 538, 162 So. 97, 99 where we said:

"We think a fair statement of the principles on which officers of a corporation may be held liable in such a suit is made in the text of 14a Corpus Juris, 102, 103, § 1869, as follows: 'The directors owe a duty of managing the corporate affairs honestly and impartially in behalf of the corporation and all the stockholders. They are liable for losses of the corporation caused by their wilful and intentional departures from duty, their fraudulent breaches of trust, their gross negligence, or their ultra vires acts. They are not liable for losses happening through mere mistakes of judgment.'

"That those are the principles, briefly stated, upon which a liability by the officers and directors of a corporation exists, is recognized by this court. (Citing our cases.)"

■ The argument has been raised, however, that at the time Baggett diverted these funds he and his wife were the sole stockholders and his wife, having knowledge thereof and acquiescing therein, thereby ratified the action of Baggett so as to have precluded recovery by the corporation. This overlooks the well-established principle that void acts of the officers of a corporation cannot be ratified by the stockholders. McKey v. Swenson, 232 Mich. 505, 205 N.W. 583; Gentry-Futch Co. v. Gentry, 90 Fla. 595, 106 So. 473; Commonwealth v. Richmond, F. & P. R. Co., 111 Va. 611, 69 S.E. 1070. This includes acts that are prohibited by statute or conflict with the statutory obligations of the corporation or which are against public policy—they cannot be ratified. Parrott v. Noel, D.C., 8 F.2d 368; Elggren v. Woolley, 64 Utah 183, 228 P. 906. Furthermore, the duty of good faith on the part of an officer is to the corporation *as an*

*entity,* distinct from its stockholders. 19 C.J.S., Corporations, § 764 pp. 112–113. The situation here is not merely appropriation of corporate funds (even with the assent of the only other stockholder); it is the falsifying of tax returns, out of which the loss or liability of the corporation arose. If liability *to the corporation* on account of the *ultra vires* acts arose, it continued to exist despite changes in the ownership of the corporate stock. That both Sellers and Baggett recognized such a liability is quite clear from the transaction whereby the corporation became the purchaser of Baggett's stock, Baggett being released from all liability. Sellers, acting for the corporation, being in a position to protect the corporation and himself from loss on account of the tax liability, and having composed that liability with Baggett, is in no position to insist upon indemnity at the hands of Head.

Another analogous principle impresses us as having influence on the situation under consideration. Where a contract fails to specify all the duties and obligations intended to be assumed, the law will imply an agreement to do those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made. Warfield Natural Gas Co. v. Allen, 248 Ky. 646, 59 S.W.2d 534, 91 A.L.R. 890. Or as otherwise stated by Professor Williston, "There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract; * * * in every contract there exists an implied covenant of good faith and fair dealing." 3 Williston, § 670, p. 1926. See also Stern v. Mayer, 166 Minn. 346, 207 N.W. 737, 46 A.L.R. 1167, for an application of the principle of implied covenants. Consonant with this principle, therefore, it could be well said that although—as found by the trial court—there was no conspiracy between Sellers and Baggett when Sellers caused the corporation to purchase Baggett's stock and release him from all liability, yet there was an implied obligation on the part of Sellers to exercise his rights against Baggett rather than rely on

enforcing his indemnity against Head, resulting that the stated transaction was in terms a breach of Sellers' implied obligation which he owed Head to also save the latter from liability, if possible, from the said defalcation of Baggett.

By virtue of the foregoing guiding principles, we are constrained to hold, as stated hereinabove, that Sellers' dealings with the primary obligor, Baggett, precluded him from invoking the aid of equity as prayed for in his bill of complaint. See also Thomas v. St. Paul's M. E. Church, 86 Ala. 138, 5 So. 508; White's Adm'r v. Life Association of America, 63 Ala. 419.

Finally, with respect to the assignments of error challenging the fixation of the amount required to be paid as a condition to the right to redeem the pledged stock, we think it sufficient to say that in assessing interest and attorney's fee the trial court merely gave effect to the notes themselves.

It results as our judgment that the decree below should be sustained.

Affirmed.

LIVINGSTON, C. J., and LAWSON, STAKELY, and MERRILL, JJ., concur.